**ROBINSON BROG LEINWAND GREENE**
  **GENOVESE & GLUCK P.C.**
875 Third Avenue
New York, New York 10022
A. Mitchell Greene
(212) 603-6300
*Proposed Attorneys for the Debtor and Debtor in*
*Possession*

**Hearing Date & Time:**
**January 7, 2016 at 10:30 a.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

In re:

**THE GIFFORD GROUP, INC.**
**D/B/A JUST PLASTICS,**

                          Debtor.

-------------------------------------------------------X

Chapter 11

15-13205-smb

## MOTION FOR ENTRY OF ORDER AUTHORIZING DEBTOR (A) TO SELL ASSETS OF THE ESTATE FREE AND CLEAR OF ANY AND ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS PURSUANT TO 11 U.S.C. SECTION 363(b) AND (f), (B) TO ASSUME AND ASSIGN EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO 11 U.S.C. SECTION 365, AND (C) GRANTING RELATED RELIEF

TO:    THE HONORABLE STUART M. BERNSTEIN
        UNITED STATES BANKRUPTCY JUDGE

        The debtor, The Gifford Group, Inc. d/b/a Just Plastics (the "Debtor"), by its proposed

attorneys Robinson Brog Leinwand Greene Genovese & Gluck P.C., seeks the entry of an order:

           (a)      pursuant to sections 105, 363(b), (f) and (m) of the United States Code
                        (the "Bankruptcy Code") and Rules 2002 and 6004 of the Federal Rules of
                        Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor
                        to sell (the "Sale"):

(i)      the Debtor's assets (the "Assets") as set forth in the Asset Purchase Agreement dated November 24, 2015 (the "APA"), free and clear of any liens, claims and encumbrances thereon to Infinite Manufacturing Group, Inc. ("Purchaser"), and approving the APA in connection therewith;

(ii)     authorizing the Debtor to transfer the Assets, and, pursuant to sections 105 and 365 of the Bankruptcy Code and Bankruptcy Rules 6006 and 9014, to assume and assign the executory contracts and unexpired leases of the Debtor as set forth in the APA in connection with the Sale;

(iii)    fixing a deadline for the filing of cure claims with respect to executory contracts and unexpired leases which are the subject of the APA; and

(b)    determining that the Purchaser acted in good faith and is entitled to the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code; and

(c)    granting such other and related relief as may be just and appropriate.

In support thereof, the Debtor states:

## <u>JURISDICTION AND VENUE</u>

1.    Jurisdiction of this civil proceeding is vested in the United States District Court for this District pursuant to section 1334 of title 28 of the United States Code.

2.    Venue of this proceeding is proper pursuant to 28 U.S.C. §1409.  This is a core proceeding arising under title 11 of the United States Code.  *See* 28 U.S.C. § 157(b)(1).  The statutory predicates for the relief sought herein include sections 105, 363 and 365 of the Bankruptcy Code.

## THE DEBTOR

3.    The Debtor operates a manufacturing company that specializes in the custom

fabrication and finishing of acrylic plastics and has been in business for over 70 years.  The

Debtor's business began to decline in 2008 as a result of the financial crisis and coupled with

changing consumer tastes caused the Debtor's sales to decline drastically.  In order to stabilize

the Debtor's operations without having to cut expenses, mainly by maintaining the Debtor's

workforce without having to lay any employees off, the Debtor obtained two secured lines of

credits and took on additional unsecured credit.  However, while the Debtor eventually had to

significantly reduce its expenses by laying off employees, with the increased debt burden, the

Debtor's operations were unable to recover and now suffers from a lack of capital and funds to

continue operations.

4.    On November 30, 2015 (the "Petition Date"), the Debtor filed a voluntary petition

for relief under chapter 11 of title 11 of the Bankruptcy Code.  On the Petition Date, the Debtor

also filed its schedules of assets and liabilities, and list of creditors and executory contracts

required pursuant to section 521 of the Bankruptcy Code and Rule 1007 of the Federal Rules of

Bankruptcy Procedure.

5.    The Debtor continues to manage and operate its business pursuant to sections

1107 and 1108 of the Bankruptcy Code.

## SUMMARY OF RELIEF REQUESTED

6.    This motion seeks approval of the Sale of substantially all of the Debtor's Assets

to Purchaser, free and clear of any and all claims, liens, encumbrances and other interests.  The

{00764559.DOC;3 }{00764559.DOC;3 }{00764559.DOC;3 }{00764559.DOC;3 }

Debtor's principal assets consist of its inventory, trade name, equipment and various leases and executory contracts as more fully defined herein. In connection with the Sale, the Debtor seeks to assume and assign to Purchaser its interest in certain equipment leases, the Manufacturing Commitments (as defined herein) and its non-residential real property lease for the Debtor's manufacturing business (the "Leases and Executory Contracts").

7.      The prompt sale of substantially all of the Debtor's Assets to Purchaser pursuant to the terms of the APA by and between the Debtor and Purchaser is in the best interests of the Debtor, its estate and its creditors and will result in the Debtor realizing maximum value for its Assets.  A copy of the APA is annexed hereto as **Exhibit A**.

8.      As such, the Debtor respectfully requests that the Court enter an order (i) authorizing the Debtor to sell the Assets to the Purchaser, free and clear of any and all claims, liens, encumbrances and other interests; (ii) authorizing entry into and approving the APA; and (iii) authorizing the assumption and assignment of the Leases and Executory Contracts in connection with the Sale.

## PROPOSED SALE OF ASSETS

9.      For the past 70 years, the Debtor fabricated custom goods from acrylic plastics. The Debtor specialized in the making of custom pieces for both commercial and personal uses, including custom furniture, custom display cases and unique designs . Due to the economic crisis of 2008, the Debtor's business suffered a steep decline in sales and revenue.  Prior to the

2008 economic crisis, the Debtor generated approximately $3 million in sales, while in 2009, the

Debtor only generated approximately $1 million in sales.

10.     Between 2008 and 2013, in order to maintain the Debtor's operations, and not

have to reduce its employee base, coupled with the belief that business would recover, the

Debtor secured various financing, including two secured loan obligations, an unsecured line of

credit, and took additional loans from the Debtor's principal.  However, business never

rebounded to pre-2008 levels.  As a result, in February 2013, the Debtor was forced to reduce its

staff from 27 employees to 13 employees.  With the reduction in staff, the Debtor was able to

operate profitably, but despite increased revenue, the Debtor was unable to service its

accumulated debt.

11.     Starting in 2013, with the assistance of Libin and Katz, a business broker, the

Debtor actively pursued potential purchasers for the Debtor's business.  The broker was able to

bring in six potential purchasers and the Debtor, through the Debtor's president, engaged in

informal discussions with these potential purchasers to gauge their levels of interest.  The

Debtor's president and the potential purchasers had informal interviews, exchanged general

information regarding the Debtor's business, and were given tours of the Debtor's facilities.

While these purchasers did express interest in acquiring the Debtor's business, no formal offers

were tendered.

12.     In 2014, the Debtor renewed its efforts to sell its business.  With the assistance of

Barry Sorrentino of the consulting firm Management Services Consultants, the Debtor's

principal was introduced to Steve Lauterback, who operated an independent marketing business and expressed significant interest in acquiring the Debtor's business. Mr. Lauterback engaged in significant due diligence and entered into a handshake deal, the terms of which were similar to the proposed APA with the Purchaser, which the Debtor now seeks approval of, however, Mr. Lauterback ultimately walked away from that deal.

13.    The Debtor also reached out to its clients to see if there was any interest in taking over the Debtor's business. In order to further these efforts, the Debtor's president met with a number of clients who had expressed an interest in acquiring the Assets, one of which was Lukas Lighting, a long-time client. Lukas Lighting expressed significant interest, but did not have the necessary cash to consummate a deal with the Debtor.

14.    Finally, the Debtor met with the Purchaser, another long time client with significant experience in the plastic industry and familiarity with the Debtor's business. Ultimately, the Purchaser proved to be the best fit. They are familiar with the Debtor's overall business and at this point were the only interested purchaser to offer "cash" in the amount of $210,000 to purchase the Debtor's business, with the Debtor retaining up to $30,000 in receivables, and payment of $85,912.75 in cure costs The Purchaser intends to continue the Debtor's operations, retain the Debtor's current employees and hopefully maintain current relationships with the Debtor's long-time suppliers.

15.     The Debtor submits that it is in the best interests of all of its creditors, its

employees and its estate to seek approval of the Sale of the Assets in order to maximize the value

of the Assets and consequently, the return for its creditors.

16.     Absent approval of the Sale as contemplated herein, the Debtor will have no

alternative but to cease operations, release its employees and liquidate its inventory.  In this

circumstance, its Assets would be sold on a fire-sale basis for a nominal sum, the going concern

value of the business would be lost and there would be insufficient funds available for a

distribution to unsecured creditors.  Based upon the proposed purchase price of $210,000 in

cash, with the Debtor retaining up to $30,000 in receivables, and payment of $85,912.75 in cure

costs, for total consideration of approximately $326,000, the Debtor submits it might file a plan

of reorganization which would provide payment to its secured and administrative creditors and

provide a distribution to unsecured creditors or a motion seeking a structured dismissal. Thus,

the Debtor believes that the terms of the proposed Sale will result in it obtaining the maximum

value for the Assets, resulting in  a distribution to its creditors that would not be likely in a

liquidation scenario and accordingly the Sale is in the best interests of the estate.

**THE PURCHASE**

17.     The following is a brief summary of certain key provisions of the APA.  The

Court and interested parties are respectfully referred to the APA for a full recitation of the terms

and conditions of the transaction.  A copy of the APA is attached hereto as **Exhibit A**.  Pursuant

to the terms of the APA, Purchaser seeks to purchase the Assets set forth in the APA, including

among others:

     i.  Machinery and Equipment;

     ii.  Supplies and Inventory;

     iii.  Lease and Executory Contracts pursuant to the APA;

     iv.  All of the Debtor's commitments for the manufacture, design and fabrication of products by the Debtor (the "Manufacturing Commitments"), including any prepayments and deposits;

     v.  Goodwill and Trademarks;

     vi.  Customer and Vendor Lists; and

     vii.  Accounts receivables in excess of $30,000 due to Seller.

18.    Excluded from the Sale are the Debtor's remaining cash on hand, the first $30,000

in outstanding accounts receivables collected by Debtor, and the right to certain tax refunds.

19.    The purchase price consists of $210,000 in cash, with the Debtor retaining up to

$30,000 in receivables, and payment of $85,912.75 in cure costs, for total consideration of

approximately $326,000.

20.    The Sale is contingent upon, among other things, bankruptcy court approval in the

Debtor's bankruptcy case and the Debtor's authorization and ability to assume and assign the

Leases and Executory Contracts.

21.    The negotiations resulting in execution of the APA took place over

approximately a 6 week period and required a substantial investment of time and effort by the

parties.  The APA fixes a deadline for the Closing to take place by January 15, 2015.  The need

to complete the Sale is therefore time sensitive.

### Approval of Sale

22.    Section 363(b) of the Bankruptcy Code provides, in pertinent part, that "the

Debtor, after notice and a hearing, may use, sell or lease, other than in the ordinary course of

business, property of the estate".  11 U.S.C. § 363(b)(1).  Inasmuch as the Assets comprise

substantially all of the Debtor's assets, the proposed Sale is outside the ordinary course of the

Debtor's business.

23.    Section 363 does not set forth an express standard for determining whether a sale

of property under section 363(b) should be approved; however, courts that have interpreted this

section consistently apply an "articulated business judgment" standard.  *See Stephen Indus., Inc.

v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Continental Airlines, Inc.*, 780 F.2d 1223,

1226 (5th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).

24.    The Court of Appeals for the Second Circuit first enunciated this standard by

stating:

> The rule we adopt requires that a judge determining a § 363(b) application
> expressly find from the evidence presented before him at the hearing *a good
> business reason* to grant such application.

*Lionel*, 722 F.2d at 1070-71 (emphasis added).

25.    Section 363(b) does not require that the Court substitute its business judgment for

that of the Debtor.  *See, e.g. Ionosphere Clubs*, 100 B.R. at 676 (court will not substitute a

hostile witness's business judgment for a debtor's, unless testimony "established that the

[debtor] had failed to articulate a sound business justification for its chosen course"). Rather, the

Court should ascertain whether a debtor has articulated a valid business justification for the

proposed transaction. This is consistent with "the broad authority to operate the business of the

Debtor . . . [which] indicates congressional intent to limit Court involvement in business

decisions by a Trustee . . . [so that] a Court may not interfere with a reasonable business decision

made in good faith by a Trustee". *In re Airlift Int'l., Inc.*, 18 B.R. 787, 789 (Bankr. S.D. Fla.

1982).

26.    Other courts have approved the sale of a debtor's assets under §363(b)(1) of the

Bankruptcy Code when (i) the sale is supported by the sound business judgment of the debtor's

management; (ii) interested parties are provided with adequate and reasonable notice; (iii) the

sale price is fair and reasonable; and (iv) the purchaser has acted in good faith. *See, e.g., In re*

*Betty Owens Schools, Inc.*, WL 188127 at *4 (S.D.N.Y. 1997) (setting forth the foregoing four

elements in connection with the 363(b)(1) inquiry and citing *In re Delaware & Hudson Ry. Co.*,

124 B.R. 169  (D. Del. 1991);  *In re General Bearing Corp.*,  136 B.R. 361, 365-66 (Bankr.

S.D.N.Y. 1992) (suggesting that the salient factors under *Lionel* are the foregoing elements).

Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as

distinct from a decision made arbitrarily or capriciously), courts will generally not entertain

objections to the debtor's conduct." *In re Ames Dept. Stores, Inc.*, 136 BR 357, 359 (Bankr.

S.D.N.Y. 1992); *In re Integrated Resources, Inc.*, 147 B.R. at 656-57 (S.D.N.Y. 1992) (a

debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate).  The Debtor has determined that the maximization of the return to creditors can best be accomplished through the proposed Sale upon the terms contained in the APA and that the transaction is in the best interests of its estate and creditors and should be approved by the Court.

27.    In determining whether a "sound business purpose" exists with respect to a sale of assets prior to confirmation of a plan, Courts have looked at such factors as:

> the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions, and most importantly perhaps, whether the asset is increasing or decreasing in value.

*Lionel*, 722 F.2d at 1071.

28.    In the Debtor's business judgment, the relief sought herein will maximize the Debtor's recovery on its Assets and is therefore in the best interests of its estate and creditors.

29.    Because of the Debtor's inability to service its debt, the Debtor has struggled to maintain consistent profitably.  As a result, the Debtor might not have the ability to propose a plan of reorganization that would provide for any greater return to its creditors.  An immediate sale is the only viable option that will allow for the continuation of the Debtor's business and a recovery to creditors on account of the Debtor's assets.  *See, e.g.*, *In re Chrysler LLC*, 405 B.R. 84, 95 (Bankr. S.D.N.Y 2009) (authorizing sale of assets outside of chapter 11 plan where sale is only viable alternative to preserve going concern value of enterprise).  Time is therefore of the

{00764559.DOC;3 }{00764559.DOC;3 }{00764559.DOC;3 }{00764559.DOC;3 }

essence with respect to the APA. The Debtor will thereafter, if appropriate, propose a

liquidating plan, or a structured dismissal, which will set forth the procedures for the distribution

of the cash component of the purchase price.

### The Debtor Has Exercised Sound Business Judgment

30.    The Debtor believes that the Sale to Purchaser represents a prudent and proper

exercise of its business judgment and is supported by articulated business reasons because,

absent such a sale, the Debtor would likely be forced to liquidate, resulting the cessation of the

Debtor's business, including the loss of jobs of the Debtor's employees, an inability to complete

works-in-process, and no distribution to unsecured creditors. With the Sale to Purchaser, the

Debtor is maximizing the value of its Assets, preserving employment for the Debtor's

employees, and generating proceeds for distribution to its various creditor constituents. *See,*

*NLRB v. Bildisco & Bildisco*, 465 U.S. 513 (1984) (the "fundamental purpose of reorganization

is to prevent the debtor from going into liquidation, with an attendant loss of jobs and possible

misuse of economic resources"); *In re Chateaugay Corp.*, 201 B.R. 48, 72 (Bankr. S.D.N.Y.

1996), *aff'd in part*, 213 B.R. 633 (S.D.N.Y. 1997) ("public policy, as evidenced by Chapter 11

of the Bankruptcy Code, strongly favors the reorganization and rehabilitation of troubled

companies and concomitant preservation of jobs and going concern values"). Without the Sale,

the Debtor has no exit scenario other than liquidation, leaving unsecured creditors with the

likelihood that there will be no funds available to distribute on account of their claims.

### The Sale Price is Fair and Reasonable

31.   The Sale to Purchaser represents the highest and best price for the Assets secured

by the Debtor to date.  In the Debtor's view, the APA represents substantial value to the Debtor's

estate and provides favorable terms for disposition of the Assets as a going concern in exchange

for fair and reasonable consideration. *See, Mellon Bank N.A. v. Metro Communications, Inc.*, 945

F.2d 635 (3d Cir. 1992); *See, also, Mellon Bank N.A. v. Official Comm. Of Unsecured Creditors*,

92 F.3d 139 (3d) Cir. 1996).  Moreover, the Debtor's arm's length negotiations with the

Purchaser ensured that the ultimate purchase price secured for the Assets is fair and reasonable

under the circumstances.  Liquidation at this point would likely result in no funds for distribution

to creditors other than a portion of the secured debt and administrative debt.  Therefore, the APA

is not only fair and reasonable as it should provide for payments to creditors in their statutory

priorities; it is also the Debtor's only viable option.  In addition, the Sale of the Debtor's

business as a going-concern is extremely important to the Debtor's employees, all of who are

going to be employed by the Purchaser, and to sustain relationships with the Debtor's vendors by

the Purchaser after the closing.

32.   A condition to the Sale is that Robert C. Vermann, the Debtor's President and

100% interest holder shall have entered into an employment agreement satisfactory to both the

Purchaser and Mr. Vermann with respect to the Purchaser's employment of Mr. Vermann.  The

Purchaser will not proceed with the Sale if Mr. Vermann is not part of the process, as his

services are necessary for the transition of the Debtor's business to the Purchaser.  Mr.

Vermann's services are also essential to the consummation of the Sale due to his years of

experience in the plastics business, including significant design experience, and his well-regarded reputation in the plastics business that will allow the Purchaser to maintain its foothold in New York City and expand the customer base.

## ASSET SALE FREE AND CLEAR OF ENCUMBRANCES

33.     The Debtor seeks approval to sell its Assets as a going concern, free and clear of any and all liens, claims or encumbrances in accordance with §363(f) of the Bankruptcy Code. A debtor-in-possession may sell property to §§363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if one of the following conditions are satisfied:

> (i)     applicable non-bankruptcy law permits sale of such property free and clear of such interest;
>
> (ii)    such entity consents;
>
> (iii)   such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (iv)    such interest is in bona fide dispute; or
>
> (v)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. §363(f).

34.     The Debtor has approximately $227,000 in secured claims, however, the Debtor is currently in the process of seeking reduced payoff amounts for its secured claims.  Upon securing reduced payoff amounts, the Debtor submits it will satisfy the requirements of §363(f).

35.     As set forth above, the APA is the product of good faith, arm's length negotiations between unrelated parties.  Consequently, the Debtor requests that this Court find that these negotiations were in good faith and that the Purchaser is a "good faith purchaser" under §363(m) of the Bankruptcy Code.

## ASSUMPTION OF EXECUTORY
## CONTRACTS AND UNEXPIRED LEASES

36.     In connection with the Debtor's request for approval of the APA, the Debtor seeks authority to assume and assign the Leases and Executory Contracts to the Purchaser.  The Leases and Executory Contracts are part of the Assets being purchased by the Purchaser and are being assumed and assigned to the Purchaser.  The Purchaser will be paying the cure costs for the Leases and Executory Contracts and will complete the Manufacturing Commitment for delivery to its customers.

37.     The Debtor is the lessee of for certain promises from LDS Church Real Estate from which the Debtor operates its business.  As part of the APA, the Purchaser intends to assume this lease and continue operations from the premises.

38.     The Debtor is also party to five (5) equipment leases — three copier leases, one lease for a forklift, and one lease for an automobile — which as part of the Sale it intends to assume and assign to the Purchaser.

39.     Additionally, the Manufacturing Commitments consist of outstanding orders received by the Debtor that remain unfinished as of the closing of the Sale and which the Purchaser intends to complete.

40.     Any remaining lease or executory contract to which the Debtor is a party, if any, will be rejected.  The Leases and Executory Contracts are necessary and vital to the continued operations of the company and as such Debtor submits their assumption and assignment to Purchaser should be authorized by the Court.  A schedule of the Leases and Exceutory Contracts is to be assumed is attached hereto as **Exhibit B**.

41.     Although §365(a) of the Bankruptcy Code does not provide a standard for determining when it is appropriate for a court to approve a debtor's assumption or rejection of an executory contract or an unexpired lease, courts have uniformly deferred to the business judgment of the debtor.  *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993) ("A bankruptcy court reviewing a trustee's or debtor-in-possession's  decision to assume or reject an executory contract should examine a contract and the surrounding circumstances and apply its "business judgment" to determine whether it would be beneficial or burdensome to the estate to assume it."); *see, also, In re Minges*, 602 F.2d 38, 43 (2d Cir. 1979); *In re G. Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994), *aff'd,* 187 B.R. 111 (S.D.N.Y. 1995) ("Generally, absent a showing of bad faith, or an abuse of business discretion, the debtor's business judgment [to assume or reject an executory contract] will not be altered.")

42.     The Bankruptcy Code provides that a debtor in a chapter 11 case "subject to the Court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  "No attempt has been made in the statute to fix the standards to be applied in determining the propriety of the [Debtor's] action."  2 L.King, COLLIER ON BANKRUPTCY, ¶

365.03 at 365-24 (15th ed. 1996).  However, a bankruptcy court is required to at least make a

finding that assumption is in the best interests of the estate and the unsecured creditors.  *Nostas*

*Associates v. Costach (In re Klein Sleep Products, Inc.)*, 78 F.3d. 18, 21 (2d Cir. 1996).  Further:

> a bankruptcy court reviewing a trustee's or debtor-in-possession's decision to
> assume or reject an executory contract should examine a contract and the
> surrounding circumstances and apply its best "business judgment" to determine if
> it would be beneficial or burdensome to the estate to assume it. . . . The process of
> deciding a motion to assume is one of the bankruptcy court placing itself in the
> position of the trustee or debtor-in-possession and determining whether assuming
> the contract would be a good business decision or a bad one.

*Orion Pictures Corporation v. Showtime Networks, Inc.*, 4 F.3d 1095, 1099 (2d Cir. 1993).

43.    As set forth above, the Debtor believes that its assumption of the Leases and

Executory Contracts and assignment thereafter to the Purchaser, in connection with the other

relief requested herein is well within the sound exercise of its business judgment.  The

assumption and assignment of the Leases and Executory Contracts and Manufacturing

Commitments are a necessary component of the Sale and a condition precedent to closing.  The

assumption and assignment of the Leases and Executory Contracts and Manufacturing

Commitments as part of the Sale will allow the Debtor to maximize the recovery for the Debtor's

estate and, as such, represents the sound exercise of the Debtor's business judgment

44.    The Debtor's right to assume an unexpired lease and/or executory contract is

subject to certain exceptions as set forth in section 365(a).  In particular, assumption is subject to

the provisions of section 365(b) of the Bankruptcy Code which provides that:

> (b)(1)    If there has been a default in an executory contract
>              or unexpired lease of the debtor, the trustee may not

assume such contract or lease, unless, at the time of assumption of such contract or lease, the trustee--

(A)     cures or provides adequate assurance that the trustee will promptly cure, such default;

(B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)     provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).  In other words, a debtor may only assume and assign an unexpired lease and/or executory contract if it cures any defaults relating to such lease and provides adequate assurance of future performance by the assignee of such lease or executory contract.  Cure and adequate assurance are a condition precedent to approval of a debtor's request to assume the lease.  11 U.S.C. § 365(b) *In re Wingspread Corp.*, 116 B.R. 915 (Bankr. S.D.N.Y. 1990).

45.     The requirements of section 365(b)(1)(A) and (B) of the Bankruptcy Code will be satisfied in this case upon the approval of the proposed assignment.  Pursuant to the terms of the APA, the Purchaser will cure any monetary defaults under the Leases and Executory Contracts to be assigned.  With respect to the Manufacturing Commitments, the Purchaser intends to complete all outstanding orders.  The Purchaser has significant experience in the plastics industry and with the assistance of Mr. Vermann, it believes such orders will be completed in the ordinary course of business.

46.    To insure that the amounts claimed by the non-debtor parties to the Leases and
Executory Contracts are fixed prior to the date of the Sale, the Debtor has included in its
schedule of Executory Contracts and Leases to be assumed and assigned its proposed cure
amount.  Parties to the Executory Contracts and Leases may object to the cure amount and in the
event of a dispute over the cure amount, such dispute will be resolved by the Court
contemporaneously with the hearing to approve the Sale of the Assets.

47.    To the extent parties require additional financial information concerning the
Purchaser and its ability to provide adequate assurance such information is available and can be
obtained by such parties on request made to Debtor's or Purchaser's counsel.

### Assignment

48.    Pursuant to section 365(f) of the Bankruptcy Code:

(1)    Except as provided in subsection (c) of this section,
notwithstanding a provision in an executory
contract or unexpired lease of the debtor, or in
applicable law, that prohibits, restricts, or
conditions the assignment of such contract or lease,
the trustee may assign such contract or lease under
paragraph (2) of this subsection. . . .

(2)    The trustee may assign an executory contract or
unexpired lease of the debtor only if—

(A)    the trustee assumes such contract or lease in
accordance with the provisions of this
section; and

(B)    adequate assurance of future
performance by the assignee of such
contract or lease is provided,

whether or not there has been a
default in such contract or lease.

11 U.S.C. § 365(f).  Thus, any provision of any executory contract to the contrary

notwithstanding, the Debtor may assign the Lease and Executory Contracts to Purchaser so long

as (i) Purchaser provides adequate assurance of future performance under the contract and (ii)

the Debtor assumes the contract in accordance with the other provision of section 365.

49.     As used in section 365(f), "'[t]he terms 'adequate assurance' of future

performance are not words of art; the legislative history of the Code shows that they were

intended to be given a practical pragmatic construction.'"  *In re Evelyn Byrnes, Inc.*, 32 B.R.

825, 828-29 (Bankr. S.D.N.Y. 1983) (quoting *In re Sapolin Paints, Inc.*, 5 B.R. 412 (Bankr.

E.D.N.Y. 1980)).  The "primary focus" of this term is "the assignee's ability to satisfy the

financial obligations imposed by the lease."  *Id*. 32 B.R. at 829 (citations omitted).

50.     The Debtor submits that the assumption and assignment of the Leases and

Executory Contracts and Manufacturing Commitments identified in the APA to the Purchaser

will be in full accord with the provisions of section 365.  Adequate assurance of future

performance will be provided by the Debtor's ability to contribute the purchase price under the

APA, the Debtor's ability to cure any defaults under the Lease and Executory Contracts and to

its commitment to operate the Debtor's business and complete the Manufacturing Commitments.

## PRIVATE SALE

51.     Bankruptcy Rule 6004(f)(1) provides in relevant part that "[a]ll sales not in the

ordinary course of business may be by private sale or by auction . . . ."

52.     The Debtors submit that under the present circumstances a private sale is appropriate.

53.     The exigencies of this case dictate that a private sale be approved.  As previously described herein, the Debtor has already engaged in substantial efforts to sell its business at the highest possible price.  The Debtor submits that conducting an auction would not result in a higher price for the Debtor's Assets and more importantly the Debtor does not have the funds to sustain its operations while it pursues an auction of its Assets. Thus, even though this is a private sale, the Debtor believes it has received the best price for the Assets and the offer made by Purchaser is the best offer under the circumstances.

54.     The Debtor respectfully submits that testing the fairness and value of the offer in an auction process will be of no benefit in these circumstances.  There simply have not been, nor does the Debtor anticipate, any other offers that will be higher than the Purchaser's offer.

## WAIVER OF STAY PERIODS

55.     To preserve the value of the Debtor's estate and expedite the closing of the transactions contemplated by the APA, it is important that the Debtor be allowed to close the Sale as soon as possible after all closing conditions have been met or waived.  Accordingly, the Debtor hereby requests that the Court waive the fourteen day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

56.    The Debtor has provided notice of this Motion to:  (a) all creditors, (b) the Office

of the United States Trustee; (c) all parties having filed a notice of appearance; and (d) all parties

to the Lease and Executory Contracts.

## CONCLUSION

57.    The Debtor submits that a sale of substantially all of its Assets pursuant to the

APA is a sound and prudent exercise of its business judgment.  The sale to Purchaser will

maximize the value of the Debtor and result in a distribution to creditors.  In addition, jobs will

be preserved.

58.    No prior application for the relief sought herein has been made to this or any

other court.

**WHEREFORE**, the Debtor seeks the entry of an order (i) pursuant to §§363(b), (f) and

(m) of the Bankruptcy code and Bankruptcy Rule 6004, authorizing the Debtor to sell the Assets

as defined in the APA free and clear of any and all claims, liens, encumbrances and other

interests thereon, ,subject to higher and better offers; approving and authorizing the Bidding

Procedures set forth in the Order to Show Cause and granting to the Debtor such other and

further relief as is just and appropriate; (ii) pursuant to §365(a) of the Bankruptcy Code,

authorizing the Debtor to assume and assign the various equipment leases, executory contracts

and unexpired leases of non-residential real property to Purchaser, and (iii) granting the Debtor

such other and further relief as the Court deems just and proper.

**DATED:**  New York, New York
           December 17, 2015

                            **ROBINSON BROG LEINWAND GREENE
                             GENOVESE & GLUCK P.C.
                            Proposed Attorneys for the Debtor**
                            1345 Avenue of the Americas
                            New York, New York  10105
                            (212) 603-6300

                      By: /s/ A. Mitchell Greene _____
                            A. Mitchell Greene

**Exhibit A**

<u>**PRIVILEGED AND CONFIDENTIAL**</u>

**ASSET PURCHASE AGREEMENT**

**between**

**INFINITE MANUFACTURING GROUP, INC.**

**and**

**THE GIFFORD GROUP, INC.**

_____

Dated: as of November 24, 2015

_____

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**") is made as of this 24th day of November 2015 ("**Agreement Date**") by and between THE GIFFORD GROUP, INC. (the "**Seller**"), dba "Just Plastics", a New York corporation , and INFINITE MANUFACTURING GROUP, INC., a New Jersey corporation ("**Purchaser**").

## W I T N E S S E T H

**WHEREAS**, Seller is engaged in the business of custom fabrication and quality finishing of acrylic plastics for a wide variety of clients and applications (the "**Business**"), with its main offices at 250 Dyckman Street, New York, NY 10034 (the "**Premises**");

**WHEREAS**, subject to the terms and conditions of this Agreement, Purchaser wishes to purchase from Seller, and Seller wishes to sell to Purchaser, certain assets of Seller used or usable in the Business, subject to the assumption of certain liabilities related to the Business; and

**WHEREAS**, it is the intention of Seller to file, prior to the consummation of such sale, a voluntary petition for relief (the "**Bankruptcy Petition**") under Chapter __ of Title __ of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court of the Southern District of New York (the "**Bankruptcy Court**") and to obtain an order form the Bankruptcy Court approving this Agreement and the transactions contemplated hereby.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

1.      **Purchase**.  Subject to the terms and conditions of this Agreement, on the Closing Date (as hereinafter defined), Seller shall sell, transfer, assign, convey, release and deliver to Purchaser, and Purchaser shall purchase and accept from Seller, free and clear of all liens, claims (as claim is defined in Section 101(5) of the Bankruptcy Code) or encumbrances, all of Seller's right, title and interest in and to the Assets (as hereinafter defined):

(a)      The Assets shall include the following:

(i)      Furniture and Fixtures.  All of the fixtures, leasehold improvements and furniture and other tangible property used in the Business, wherever located, including the items listed on **Schedule 1** (the "**Fixtures**").

(ii)     <u>Machinery and Equipment.</u>  All machinery, equipment, tooling, patterns, molds, parts, office equipment, vehicles and other fixed assets owned by Seller and used in connection with the operation of the Business, including without limited, all of the items listed on **<u>Schedule 1</u>** (the **"Equipment"**).

(iii)     <u>Supplies and Inventory</u>.  All of Seller's Inventory and other supplies used in or held for sale in the Business, including the items listed on **<u>Schedule 1</u>** hereof (the **"Supplies"**). "Inventory" means, as of any date, all of the good, useable and merchantable inventories of (a) plastics and other raw materials, work in process, finished goods and other tangible personal property held by Seller for resale or currently consumed in the production of Seller's products and finished goods, and (b) spare parts, wrapping and packaging items, and similar items owned by Seller and which are not damaged, defective or obsolete.

(iv)     <u>Assigned Contracts</u>.  So long as any Cure Costs[1] are paid, all contracts, purchase orders, sales orders, equipment leases, software licenses (to the extent assignable) and other contracts listed on **<u>Schedule 1</u>** hereof (the **"Assigned Contracts"**).

(v)     <u>Designs; Plans</u>.  Any and all plans, sketches, designs, photographs, renderings, or blueprints with respect to products sold or to be sold by Seller and in Seller's possession and control.

(vi)     <u>Commitments</u>.  All of Seller's rights on the Closing Date under any Commitments of Seller with customers for the manufacture, design, and fabrication of products by Seller (the "**Manufacturing Commitments**"), together with all prepayments and deposits from customers with respect thereto. "Commitments" means any contract, agreement, indenture, note, bond, lease, conditional sale contract or other binding arrangement, whether written or oral.

(vii)     <u>Goodwill; Name; Domain Name; Telephone Numbers; Accounts and Passwords</u>.  All of the goodwill of Seller.  The Trademark names and all forms and permutations of such names. The domain name "www.justplastics.com", together with all other domain names

---

[1] "<u>Cure Costs</u>" shall mean a finding by the Bankruptcy Court in a Final Order determining the amount required to be paid to cure any outstanding defaults under an Assigned Contract or the Manufacturing Commitments.

owned by Seller and all passwords and log-in information necessary to maintain and modify such websites. All email addresses, telephone and facsimile transmission numbers owned by Seller.

(viii)    <u>Proprietary Technology</u>.    All proprietary technology, including all manuals, business and policy manuals, performance standards, quality control standards, know-how, reports, processes, research and other data, trade secrets, computer software and programs, formulae, inventions and other ideas used in the Business (collectively the "**Proprietary Technology**").

(ix)    <u>Customer, Vendor and Sales Referral Information</u>.    All current or historical information relating to customers and to vendors or other suppliers and referral sources, including all customer, vendor, supplier, and referral lists including contact information, mailing and email lists, price lists, customer files, account histories, correspondence and other recorded knowledge relating to customers, vendors, suppliers and referral sources.

(x)    <u>Product Catalogs; Sales Documents</u>.    All product lists and catalogues, including price lists, used in the Business.    All documents utilized in the Business to support sales containing, among other things, product information, specifications, selling points and warranties.

(xi)    <u>Accounts Receivable</u>.    All of Seller's accounts receivable, in excess of $30,000 due to the Seller from customers resulting from the ordinary conduct of the Business prior to the Closing shall belong to the Purchaser. The parties acknowledge that upon following the Closing, Buyer shall be entitled to collect all of Seller's accounts receivable, and upon collection thereof, will remit and pay over to Seller the first $30,000 collected therefrom.

(xii)    <u>Prepaid Expenses.</u>    All prepaid or deferred expenses, including all deposits, advertising and promotional materials, catalogs and labels (collectively, "**Prepaid Expenses**").

(xiii)    <u>Permits</u>.    All licenses, franchises, permits, variances, certificates and other approvals issued by any Governmental Authority relating to the Assets and the Business ("**Permits**").

(xiv)    <u>Trademarks; Patents; and Copyrights</u>.  All of Sellers' rights in and to all United States and foreign trademarks, trademark applications, trade names, service marks and the like, if any, including the name and mark "**Just Plastics**," and all derivatives thereof (collectively, "**Trademarks**").  All rights in and to all United States and foreign patents and patent applications (collectively, "**Patents**"), copyrights and copyright applications, (collectively "**Copyrights**", and together with the Trademarks and Patents, hereinafter referred to as the "**Intellectual Property**").

(xv)    <u>Warranties</u>.  Any manufacturer or other warranties or guarantees covering any of the Assets.

(xvi)    <u>Securities</u>.  Any temporary investments in marketable securities, certificates of deposit and bank accounts.

(xvii)    <u>Records</u>.  All books and records relating to the operation of the Business prior to Closing, including but not limited to all financial and personnel records related to the operation of the Business and any records related to the Assets.

(xviii)  <u>Security and Other Deposits</u>.  Security deposits pertaining to any rent security deposit under any existing lease at or arrangement related to the Premises.

(b)    <u>Excluded Assets</u>.  Notwithstanding anything herein to the contrary, the following are not intended by the parties to be a part of the Assets that are being purchased by Purchaser hereunder and shall be deemed **"Excluded Assets"**:

(i)    All employee benefit plans of Seller within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended (ERISA), which are presently in effect and relate to the operation of the Center, including any assets or liabilities owned or held by any such plan.

(ii)    Any other asset listed on **Schedule 2** hereof.

(iii)    The real estate lease for Seller's Premises, located at 250 Dyckman Street, New York, NY 10034, it being understood that Purchaser shall have the right, but not the obligation, to negotiate a new lease for the Premises;

{00763142.DOCX;1 }4

(iv)    All of the cash of the Seller as well as the first $30,000 of accountants receivable of the Seller collected by Buyer in accordance with Section 1.2(a)(xi), from the pre-closing period.

(v)    All claims made or which may be made by Seller to any governmental authority relating to refunds for Taxes with respect to any transactions or periods relating to the Business occurring prior to or ending on the Closing Date.

2.    **Liabilities; Risk of Loss**

(a)    <u>Assumed Liabilities</u>.    In connection with its acquisition of the Assets, Purchaser shall at the Closing assume only the following liabilities and obligations of Seller (the "**Assumed Liabilities**"):

(i)    executory obligations of Seller under the Assigned Contracts and the Manufacturing Commitments, <u>excluding</u>, however, any liability or obligation arising out of any defaults thereunder or which Seller was obligated to have performed or discharged prior to the Closing Date;

(ii)    executory obligations of Seller under the personal property leases listed on **Schedule 1**, <u>excluding</u>, however, any liability or obligation arising out of any defaults thereunder or which Seller was obligated to have performed or discharged prior to the Closing Date.

(b)    <u>Excluded Liabilities</u>.    Other than the Assumed Liabilities, Purchaser shall not be deemed to have assumed, and Seller shall remain responsible for, any claims, liabilities, obligations, lawsuits or debts of Seller  and the Business of any type or nature, whether known or unknown, fixed, contingent or otherwise, and whether or not threatened or pending, including, but not limited to: (i) liability based on tortious or wrongful actions; (ii) taxes of any kind; (iii) wages or benefits for employees or agents, including any vacation pay or severance or benefit payments to any former employees or agents; (iv) payment of rent, service fees or any types of invoices payable by Seller; and (v) recoupment or refund of amounts paid by any third party payor, including refunds requested by federal, state or local government (collectively referred to hereinafter as the "**Excluded Liabilities**").

(c)     <u>Risk of Loss</u>.  Seller shall bear all risk of destruction, loss or damage to the Assets due to fire or other casualty until the Closing Date.  In the event of any destruction, loss or damage to the Assets of Twenty-Five Thousand Dollars ($25,000.00) or less, the Purchase Price (as defined below) shall be adjusted at the Closing to reflect such destruction, loss or damage, in such amounts as Purchaser and Seller shall agree upon in good faith.  In the event of such destruction, loss or damage to the Assets in excess of Twenty-Five Thousand Dollars ($25,000.00), Purchaser may, at its discretion, elect to (i) adjust the Purchase Price to reflect such destruction, loss or damage, or (ii) to terminate this Agreement and the transactions contemplated hereby.

3.     **Purchase Price**.

(a)     <u>Purchase Price</u>.  The total purchase price for the Assets shall be TWO HUNDRED TEN THOUSAND Dollars ($210,000.00)(the "**Purchase Price**"), which shall be payable as follows: (i) Twenty-Five Thousand Dollars ($25,000.00) as of the Effective Date (the "**Deposit**")  which shall be credited against payment of the Purchase Price at Closing and (ii) be ONE HUNDRED EIGHTY-FIVE THOUSAND Dollars ($185,000) in immediately available funds at Closing subject to the adjustments set forth in Section 3(b).

(b)     <u>Closing Adjustments</u>.  The Purchase Price shall be increased by the amount of any, Cure Costs, pre-paid rent, real estate taxes, service charges and utilities for periods on or after the Closing Date, and reduced by the amount of any accrued and unpaid rent, real estate taxes, service charges, utilities and interest on the Deposit for periods prior to the Closing Date.

(c)     <u>Deposit</u>.  Immediately upon execution and delivery of this Agreement by Seller and Purchaser, Purchaser shall remit payment of the Deposit to Seller's bankruptcy counsel Robinson Brog Et al. ("RB") pursuant to wire instructions provided by RB to Purchaser's counsel, which $25,000 payment shall constitute the Deposit hereunder.  The Deposit shall be non-refundable..

(d)     <u>Allocation</u>.  The Purchase Price shall be allocated among the Assets being purchased hereunder in the manner set forth on **Schedule 3.**   The parties hereto agree that (i) the allocation of the Purchase Price hereunder to items, classes and categories of the Assets as set forth in **Schedule 3** reflects and constitutes arms-length negotiations between the parties hereto; and (ii) the foregoing allocations is reasonable based on the parties' estimates of the fair market value as of the Closing Date of each such class of Assets. The allocation reflected in **Schedule 3** shall be binding on the parties for United States and all state income tax purposes and shall be consistently reflected by each such party on its United States and all state income tax returns.

4.      INTENTIONALLY LEFT BLANK

5.      **Closing; Termination**

(a)     Closing.  The closing under this Agreement (the "**Closing**") shall take place at the offices of counsel for Purchaser, Brown Moskowitz & Kallen, P.C., 180 River Road, Summit, NJ 07901.  Closing shall be effective for accounting and all other purposes as of 12:01 a.m. EST on the date of Closing (the "**Closing Date**"), unless otherwise agreed in writing by Seller and Purchaser.

(b)     Closing Date.  The Closing shall occur on the third business day following the day on which Bankruptcy Court issues a Sale Order (as defined in Section 6 hereof) or at such other date and time as the parties shall have agreed to in writing.

(c)     Termination by Mutual Consent.   This Agreement may be terminated at any time prior to the Closing by mutual written agreement of Seller and Purchaser. In the event the termination of this Agreement is pursuant to this Section 5(d), the Deposit shall be delivered in accordance with the mutual written agreement of the parties.

(d)     Termination by Seller.   Seller may terminate this Agreement at any time prior to the Closing Date if:

(i) there has been a material breach by Purchaser of any of its representations and warranties contained in this Agreement;

(ii) there has been a material breach of any of the covenants or agreements set forth in this Agreements on the part of Purchaser, which breach is not curable or, if curable, is not cured within thirty (30) days after written notice of such breach is given by Seller to Purchaser;

(iii) the conditions to the obligations of Seller set forth in Section 10 shall not have been waived or satisfied on or before the date specified therefor;

(iv) the Bankruptcy Court shall not have issued the Sale Order in favor of this Agreement on or before January 15, 2016; or

(v) the Closing shall not have occurred by January 31, 2016; provided, however, that the right to terminate by Seller shall not be available under this Section 5(d) if the Closing shall not have occurred by such date as a result of the failure of Seller to fulfill any of its obligations under this Agreement.

(e)    Termination by Purchaser.    Purchaser may terminate this Agreement at any time prior to the Closing Date if:

(i)    there has been a material breach by Seller of any of its representations and warranties contained in this Agreement;

(ii)    there has been a material breach of any of the covenants or agreements set forth in this Agreements on the part of Seller, which breach is not curable or, if curable, is not cured within thirty (30) days after written notice of such breach is given by Purchaser to Seller;

(iii)    the conditions to the obligations of Purchaser set forth in Section 9 shall not have been waived or satisfied on or before the date specified therefor;

(iv)    Seller shall suffer a destruction or loss of damage to the Assets due to fire or other casualty in excess of Twenty-Five Thousand Dollars ($25,000.00);

(v)    the Bankruptcy Court shall not have issued the Sale Order in favor of this Agreement on or before January 15, 2016; or

(vi)    the Closing shall not have occurred by January 31, 2016; provided, however, that the right to terminate by Purchaser shall not be available under this Section 5(e) if the Closing shall not have occurred by such date as a result of the failure of Purchaser to fulfill any of its obligations under this Agreement.

(f)    Effect of Termination.    In the event of the termination of this Agreement pursuant to Section 5(d) or Section 5(e), as applicable, written notice thereof shall as promptly as practicable be given to the other party to this Agreement, in accordance with the notice provisions set forth in Section 14, and this Agreement shall terminate and the transactions contemplated hereby shall be abandoned, without further action by any of the parties hereto. If this Agreement is terminated as provided in Sections 5 (c) and (d) or (e):

(i)    all obligations of the parties shall terminate; and

(ii)    if termination is effected by Seller pursuant to Sections 5(d)(i), (ii), (iii) or (iv), then the Deposit together with all accrued interest thereon shall be delivered to Seller; otherwise, the Deposit together with all accrued interest thereon will be refunded to Purchaser; provided, however, that in the event termination is effected by Seller pursuant to Section 5(d)(iii) by reason of the fact that the conditions to the obligations of Seller set forth in Section 10(d) shall not have been waived or satisfied on or before the date specified therefor, then the Deposit together

with all accrued interest thereon shall be refunded to Purchaser; and

(iii)    if termination is effected by Purchaser pursuant to Sections 5(f)(i) through (vi), then the Deposit together with all accrued interest thereon shall be refunded to Purchaser; and

(iv)    each party shall have available to it such remedies as may exist at law or in equity.

6.    **Bankruptcy Court Approval.**    Immediately following the execution of this Agreement by all parties, Seller shall proceed to have this Agreement and the transactions contemplated thereby approved by the Bankruptcy Court in their entirety by way of a final, non-appealable Sale Order (the "Sale Order").    The  Sale Order shall be in form and substance reasonably acceptable to Purchaser in its sole discretion and shall provide for all necessary and customary findings and holdings, including, but not limited to: (i) the purchase and sale shall be free and clear of all Liens, claims and encumbrances pursuant to Section 363 of the Bankruptcy Code; (ii) assignment of the Assigned Contracts  and Manufacturing Commitments to Purchaser free and clear of all liens, claims and encumbrances pursuant to Sections 363 and 365 of the Bankruptcy code, with any Cure Costs affiliated with the assignment of such Manufacturing Commitment to be paid from the proceeds of the Purchase Price; (iii) TIME IS OF THE ESSENCE AND A PROMPT CLOSING IS NECESSARY TO PRESERVE THE VALUE OF THE PROPERTY; and (iv) the ten day automatic stays under Bankruptcy Rules  6004(g) and 6006(d) are waived for cause (the "**Ten Day Waiver**").  Purchaser shall reasonably but promptly cooperate with the Seller in providing any information and evidence that may be reasonably required to demonstrate to the Bankruptcy Court's satisfaction: (i) Purchaser's good faith under Section 363(m) of the Bankruptcy Code such that the reversal or modification on appeal of the Sale Order shall not affect the validity of the sale of the Assets as contemplated hereunder, and (ii) adequate assurance of Purchaser's future performance under the Assigned Contracts and Manufacturing Commitments.[2]

---

[2] The following definitions apply for the purposes of this Section:

"Liens" means any mortgage, deed of trust, pledge, assignment, security interest, encumbrance, lien, mechanics liens, charge, hypothecation, deemed trust, action, easement, charge or otherwise, or claim of any kind or nature whatsoever in respect of any property, other than any license of Intellectual Property, including any of the foregoing created by, arising under, or evidenced by any conditional sale or other title retention agreement, the interest of a lessor under a capital lease, any financing lease having substantially the same economic effect as any of the foregoing, or the filing of a financing statement naming the owner of the property as to which such lien relates as the debtor under the Uniform Commercial Code or any comparable Law in any other jurisdiction.

7.    **Seller's Representations, Warranties and Covenants**.    In order to induce Purchaser to enter into this Agreement, Seller makes the following representations and warranties to Purchaser:

(a)    Authorized Action. Subject to the Bankruptcy Court's entry of the Sale Order, all requisite actions required in connection with the execution, delivery and performance of this Agreement and any other documents contemplated hereby have been duly and validly taken and, without limitation of the foregoing, the execution, delivery and performance of this Agreement and any other documents necessary to effectuate the transactions contemplated herein (the **"Transaction Documents"**) have been duly and validly authorized by Seller.

(b)    Binding Agreement; Organization. Subject to the Bankruptcy Court's entry of the Sale Order, this Agreement and each of the Transaction Documents, when executed and delivered, will be the legal, valid and binding obligation of Seller enforceable in accordance with their respective terms.  Seller is a corporation, validly existing and in good standing under the laws of the State of New York.  Seller has full power and authority to own, lease or otherwise hold its properties and assets and to carry out the transactions contemplated hereby and to conduct the business presently being conducted by Seller.  Seller is not qualified to do business as a foreign corporation in any other state, and does not have any subsidiaries.

(c)    Power and Authority.  Except as set forth on **Schedule 7** and subject to the Bankruptcy Court's entry of the Sale Order, Seller has all requisite power and authority to execute, deliver and perform this Agreement and deliver the all documents required to be delivered by it under this Agreement.

(d)    Absence of Conflicting Agreements. Except as set forth on **Schedule 7** and except as would not have a material adverse effect on the Assets  and subject to the Bankruptcy Court's entry of the Sale Order, neither the execution nor delivery of this Agreement or any of the documents contemplated hereby, nor the performance of the transactions contemplated hereby and thereby, conflicts with, or constitutes a breach of or a default by Seller under; (i) any applicable law, rule, judgment, order, writ, injunction or decree of any court currently in effect; or (ii) any applicable rule or regulation of any administrative agency or other governmental authority currently in effect and applicable to Seller, as applicable; or (iii) any agreement, indenture, contract or instrument to which it is now a party or by which any of its Assets are bound.

(e)    Consents.  Except as set forth on **Schedule 7** and subject to the Bankruptcy Court's entry of the Sale Order, Seller is not required to obtain any approval or consent or make

any filing with any person, entity or governmental agency or authority in connection with Seller's execution and delivery of this Agreement and the Transaction Documents.

(f)　　Compliance with Law and Instruments.　Except as set forth on **Schedule 7**, to Seller's knowledge, the Business has been conducted, in all material respects, in compliance with all applicable laws, rules, and regulations, except for violations which, individually or in the aggregate, did not or would not have a material adverse effect on the Assets and the Business. Except as set forth on **Schedule 7**, to Seller's knowledge, Seller has not received notice that the operation of the Business has not been in compliance with all applicable laws, rules, regulations and ordinances, except for possible violations that would not have a material adverse effect on the Assets and the operations of the Business.

(g)　　Sufficiency of Assets.　To the knowledge of Seller, the Assets constitute the assets of Seller necessary to operate the Business in the manner presently operated by Seller.

(h)　　Title to Assets.　Seller  has good and marketable title to the Assets and, subject to the Bankruptcy Court's entry of the Sale Order, shall, on the Closing Date, deliver the Assets free and clear of any mortgage, pledge, lien, charge, security interest or encumbrance, of any kind (collectively, "**Liens**").

(i)　　Condition of Property.　All Fixtures and Equipment included in the Assets are in good condition and working order, ordinary wear and tear excepted.　All manufacturer warranties for the Equipment, Supplies and personal property, if any, which are in the possession of Seller, shall be transferred to Purchaser at the Closing.

(j)　　Contracts.　**Schedule 7** sets forth a complete and accurate list of all oral and written agreements, contracts and commitments (i) requiring annual payments in excess of Five Thousand Dollars ($5,000.00) to which Seller is a party; or (ii) which are not cancellable by Seller or its assignee on thirty (30) days notice or less, which relate to the operation of the Business or by which any of the Assets is bound (the "**Contracts**"). Subject to the Cure Costs being paid except as indicated on **Schedule 1**, subject to the Cure Costs being paid  each of the Assigned Contracts and Manufacturing Commitments is in full force and effect and Seller is not in material default under any Assigned Contract or Manufacturing Commitment.　To Seller's knowledge, there has not been asserted, either by or against Seller under any Assigned Contract or Manufacturing Commitment, any written notice of default, set-off or claim of default.　To the knowledge of Seller, the parties to the Assigned Contracts or the Manufacturing Commitments other than Seller are not in default of any of their respective obligations under the Assigned Contracts or Manufacturing Commitments, and to the knowledge of Seller, there has not occurred any event which with the passage of time or

the giving of notice (or both) would constitute a default or breach under any Assigned Contract or Manufacturing Commitment.

(k)     Assigned Contracts.     True copies of the Assigned Contracts and Manufacturing Commitments have been delivered to Purchaser.  All such Assigned Contracts and Manufacturing Commitments are attached to **Schedule 7** hereto.

(l)     Litigation.  Except for the Bankruptcy Case and as otherwise set forth on **Schedule 7**, there are no legal actions, litigation, suits, administrative proceedings, government proceedings, arbitrations, judgments, orders, writs or injunctions presently pending or to Seller's knowledge threatened against the Business or its Assets, and Seller is not aware of any facts that it reasonably anticipates may result in such action, suit, arbitration or other proceeding.

(m)     Governmental Permits.  Set forth on **Schedule 7** is a true and correct list of all governmental permits, licenses, certificates and approvals of any kind which are held by Seller and material to the operation of the Business (collectively the "**Permits**").  All of the Permits are in full force and effect.  Except as set forth on **Schedule 7**, to Seller's knowledge, Seller has not received any notices of any claim, default, deficiency or violation or any other proceeding, relating to any Permit.

(n)     Employment; Labor Matters.     None of the individuals employed, engaged or leased by Seller is represented by any union or other collective bargaining representative nor, to Seller's knowledge, are there currently any attempts by any union or other collective bargaining representative to organize employees and there have been no such attempts within the last year.  All employees of Seller are employees at will.

(o)     Employee Benefit Plans.  Except as set forth on **Schedule 7**, Seller has no unfunded liabilities under any pension or other employee benefit plan, which it may have established or to which it is bound.

(p)     No Unusual Arrangements with Employees.     Seller has no cash compensation  arrangements with any of its employees.  All employees are paid through Seller's payroll system and receive only the payments disclosed by such system.

(q)     Accounts Receivable.  Each account receivable of each Seller constitutes a valid claim for the full amount against the account debtor; and arises from a bona fide sale and is not due from any employee or other Affiliate of Seller.  To the best of Seller's knowledge, all

Business accounts of Seller can reasonably be expected to be collected within 90 days of the creation thereof. Seller acknowledges and agrees that Buyer shall have the sole and exclusive right to collect such accounts receivable in such manner as it deems appropriate. All payments of accounts receivable received by Seller on or after the Closing Date shall be immediately forwarded to Purchaser. Seller shall cooperate with and be subject to the direction of Buyer in the collection of such accounts receivable.

(r)    Intellectual Property.  To the best of Seller's knowledge, (i) Seller has not infringed any patents, trademarks, trade name rights, service marks, copyrights, applications for any of the foregoing or similar intellectual property of any Person, and (ii) no third party has infringed any Intellectual Property rights of Seller.  **Schedule 7** lists (x) all United States and foreign patents, trademarks, trade names, service marks, copyrights presently owned by Seller in whole or in part and any applications (whether or not filed) for any of the foregoing, together with the jurisdictions in which such Intellectual Property is registered (if registered), the name of the registered owner if different from Seller, the date of registration (or filing as to filed applications) and the expiration date thereof; (y) all technical assistance, licensing (as licensor or licensee), know-how, engineering, consulting, employee and other agreements relating to the Intellectual Property to which Seller is a party, by which it or its assets are bound or pursuant to which it has rights; and (iii) all proceedings involving any Intellectual Property.  Seller has provided Buyer with true and complete copies of all agreements referred to in (y) of the immediately preceding sentence.

(s)    Taxes.  Except as set forth on **Schedule 7**, Seller has:

(i)    timely filed or caused to be filed with appropriate governmental agencies or departments all Federal, state, local and foreign returns (the "**Tax Returns**") for Taxes (as hereinafter defined) required to be filed by it; and

(ii)    paid or caused to be paid, or have made adequate provision or set up an adequate accrual or reserve for the payment of, all Taxes required to be paid in respect of the periods for which such Tax Returns are due or filed any or all necessary appeal(s) related thereto.

For the purposes of this **Section 7(s)**, the term "**Tax**" or "**Taxes**" shall include but not be limited to, those related to income, gross receipts, gross income, sales, use, excise, occupation, services, leasing, valuation, transfer or license.

(t)    No Brokers.  No broker or finder has acted for Seller in connection with the transactions contemplated by this Agreement, and no broker or finder is entitled to any broker's or

finder's fee or other commission in respect thereof based in any way on agreements, understandings or arrangements with Seller regarding the transactions contemplated by this Agreement.

(u)    Insurance.   At all times during the operation of the Business, Seller has maintained and will continue to maintain through the Closing Date, insurance coverage against general liability, professional liability and property loss or casualty on all aspects of Seller's operation of the Business, including but not limited to its Assets and personnel (the "**Insurance**"). Seller shall keep said Insurance in full force and effect through midnight on the Closing Date.

(v)    Hazardous Substances.   Seller has not caused or permitted the Assets or the Business to be used to generate, manufacture, refine, transport, treat, store, handle, dispose, transfer, produce or process Hazardous Substances (as hereinafter defined), or other dangerous or toxic substances, oils, or solid waste (other than as such may be usual and customary in the operation of the Business, the "**Permitted Substances**"), and Seller has not caused or permitted any Release (as hereinafter defined) of any Hazardous Substance on or offsite of the Premises. "**Hazardous Substances**" include any pollutants, dangerous substances, toxic substances, hazardous wastes, hazardous materials, oils, or hazardous substances as defined in or pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601-9657 ("**CERCLA**"), or any other federal, state or local environmental law, ordinance, rule or regulation as such laws, ordinances, rules or regulations exist as of the date hereof.   "**Release**" means releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, disposing or dumping.   Seller has caused all Permitted Substances arising from the operations of the Business to be disposed of in accordance with applicable laws and regulations. Seller has not received any notice from any governmental agency that Seller is a potentially responsible party in any proceeding under any state or local environmental statute or regulation.

(w)    Disclosure.   No representation or warranty by Seller in this Agreement and no information in any statement, certificate, schedule or other document furnished or to be furnished to Purchaser pursuant hereto, or in connection with the transactions contemplated hereby, contains any untrue statement of a material fact, or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading as of the date of execution of this Agreement by the parties hereto.

(x)    Records.   The business and financial records of Seller are complete and correct in all material respects.

8.    **Purchaser's Representations, Warranties and Covenants**.  In order to induce Seller to enter into this Agreement, Purchaser makes the following representations and warranties to Seller:

(a)    <u>Organization and Standing</u>.    Purchaser is a corporation, duly organized, validly existing and in good standing under the laws of the State of New Jersey.  Purchaser has all power and authority to carry on its business as now conducted and all governmental licenses, authorizations, consents and approvals to carry on its business as now conducted.

(b)    <u>Power and Authority</u>.  All corporate actions required in connection with the execution, delivery and performance of this Agreement and any other documents contemplated hereby have been duly and validly taken and, without limitation of the foregoing, the execution, delivery and performance of this Agreement and any Transaction Documents have been duly and validly authorized by Purchaser's Board of Directors.

(c)    <u>Binding Agreement</u>.  This Agreement and each of the Transaction Documents, when executed and delivered, will constitute legal, valid and binding obligations of Purchaser enforceable in accordance with their respective terms.

(d)    <u>Power and Authority</u>.    Purchaser has all requisite power and authority to execute, deliver and perform this Agreement, and as of the Closing, will have all requisite power and authority to execute and deliver the all documents required to be delivered by it at Closing and to consummate the transactions contemplated hereby.

(e)    <u>Absence of Conflicting Agreements</u>.  Neither the execution or delivery of this Agreement or any of the documents contemplated hereby, nor the performance of the transactions contemplated hereby and thereby, conflicts with, or constitutes a breach of or a default by Purchaser under: (i) its Certificate of Incorporation or By-Laws; or (ii) any applicable law, rule, judgment, order, writ, injunction, or decree of any court currently in effect; or (iii) any applicable rule or regulation of any administrative agency or other governmental authority currently in effect; or (iv) any agreement, indenture, contract or instrument to which it is a party.

(f)    <u>Brokers</u>.  No broker or finder has acted for Purchaser in connection with the transactions contemplated by this Agreement, and no broker or finder is entitled to any broker's or finder's fee or other commission in respect thereof based in any way on agreements, understandings or arrangements with Purchaser.

(g)    <u>Governmental Authorizations</u>.    Other than the consent of the Bankruptcy Court, no material consent, approval or other authorization of, or material filing with any governmental authority or expiration of any governmentally imposed waiting period is required in connection with the execution and delivery by Purchaser of this Agreement and the Transaction Documents to which Purchaser will be a party or the consummation by Purchaser of those

{00763142.DOCX;1 } 15

transactions contemplated thereby except those consents, approvals, authorizations or filings obtained prior to Closing.

(h)    <u>Financial Ability to Close Transaction</u>.    Purchaser has the financial resources available to pay the Purchase Price, when due and owing in accordance with the terms and conditions of this Agreement.

9.    **<u>Conditions Precedent to Purchaser's Obligation to Close</u>**.    In addition to Sale Order being approved by the Bankruptcy Court, the obligation of Purchaser to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction and fulfillment, prior to or on the Closing Date, of the following conditions precedent; provided, however, that, other than with respect to Sections 9(e) and 9(g), Purchaser shall have the right to waive any such conditions, in its sole discretion, upon written notice to Seller:

(a)    <u>Representations, Warranties and Covenants.</u>    The representations and warranties of Seller made in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as though such representations and warranties were made at and as of such time except to the extent affected by the transactions herein contemplated.    Seller shall have performed and complied in all material respects with all its covenants and agreements contained in this Agreement required to be performed and complied with by it at or prior to Closing.

(b)    <u>Proceeding and Instruments Satisfactory</u>.    All proceedings, company or otherwise, to be taken in connection with the transactions contemplated by this Agreement, and all documents incident thereto, shall be reasonably satisfactory in form and substance to Purchaser. Seller shall have made available to Purchaser for examination the originals or true and correct copies of all documents which Purchaser reasonably may request, and which are in Seller's possession or control, in connection with the transactions contemplated by this Agreement.

(c)    <u>No Adverse Change</u>. From the Agreement Date through the Closing Date, there shall not have occurred any material adverse change in the condition of the Assets or the Business.

(d)    <u>Insurance</u>. Seller shall have provided evidence to Purchaser of reasonable and customary occurrence based and/or claims based liability insurance to insure against all claims arising out of any and all occurrences in connection with the operation of the Business, including any and all claims related to the Premises at which Seller is located, may have prior to the Closing Date.

(e)     <u>Termination of Seller's Employees</u>.  Seller shall have terminated all of the its employees and independent contractors ("**Seller Employees**") as of the Closing Date.

(f)     <u>Lease Contingency</u>.  Simultaneously herewith, Purchaser, as lessee, and the Corporation Of The Presiding Bishop Of The Church Of Jesus Christ Of Latter-Day Saints , as landlord for the Premises, shall have entered into a Lease Agreement for the Premises in form and substance acceptable to Purchaser.

10.     **Conditions Precedent to Seller's Obligation to Close**.

In addition to Bankruptcy Court approval required by Section 6 hereof, the obligation of Seller to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction and fulfillment, prior to or on the Closing Date, of the following conditions precedent; provided, however, that Seller shall have the right to waive any such conditions, other than the Bankruptcy Court approval, in its sole discretion, upon written notice to Purchaser:

(a)     <u>Representations, Warranties and Covenants.</u>     The representations and warranties of Purchaser made in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as though such representations and warranties were made at and as of such time except to the extent affected by the transactions herein contemplated.  Purchaser shall have performed and complied in all material respects with all its covenants and agreements contained in this Agreement required to be performed and complied with it at or prior to Closing.

(b)     <u>Proceeding and Instruments Satisfactory</u>.  All proceedings, corporate or otherwise, to be taken in connection with the transactions contemplated by this Agreement, and all documents incident thereto, shall be satisfactory in form and substance to Seller; and, Purchaser shall have made available to Seller for examination the originals or true and correct copies of all documents which Seller reasonably may request in connection with the transaction contemplated by this Agreement.

(c)     <u>Delivery</u>.  All documents required to be delivered to Seller at or prior to the Closing shall have been so delivered, in a form reasonably acceptable to Seller.

(d)     <u>Governmental Prohibition of the Transaction</u>.  No court or any other governmental entity shall have issued an order restraining or prohibiting the transactions herein contemplated; no governmental entity or third party shall have commenced or threatened in writing

to commence any action or suit before any court of competent jurisdiction or other governmental entity that seeks to restrain or prohibit the consummation of the transactions contemplated hereby or impose material damages or penalties in connection therewith.

(e)    <u>Real Estate Purchase/Lease Contingency</u>.    Purchaser, as lessee, and the Corporation Of The Presiding Bishop Of The Church Of Jesus Christ Of Latter-Day Saints, as landlord for the Premises, shall have entered into a Lease Agreement for the Premises substantially in the form annexed to the Agreement of Sale.

11.    **Closing Deliveries by Seller**.  At or before the Closing, Seller shall  deliver or cause to be delivered to Purchaser the following instruments, documents and items:

(a)    A Closing Certificate of Seller in the form attached hereto as **Exhibit A**.

(b)    A Bill of Sale, in the form of **Exhibit B** attached hereto and made a part hereof, sufficient to vest in Purchaser good title to the Assets, free and clear, in accordance with the Sale Order, of all Liens.

(c)    Possession of the Assets and keys to the Premises.

(d)    An Assignment and Assumption Agreement in substantially the form attached hereto as **Exhibit C**.

(e)    All other instruments and documents, if any, required to be executed, acknowledged and/or delivered by Seller to Purchaser pursuant to and in accordance with any of the other provisions of this Agreement.

12.    **Closing Deliveries by Purchaser**.    At the Closing, Purchaser shall execute, acknowledge and/or deliver to Seller the following payments, instruments and documents:

(a)    A Closing Certificate of Purchaser in the form attached hereto as **Exhibit D**.

(b)    Incumbency certificates in respect of the officers of Purchaser who execute this Agreement and the closing documents and certified resolution of directors authorizing this Agreement and the transactions provided herein, in the form attached hereto as **Exhibit E**.

(c)    The balance of the Purchase Price, subject to adjustments, set forth in Section 3.

(d)    Certificate of the good standing of Purchaser from the New Jersey Secretary of State, dated not earlier than ten (10) business days prior to Closing.

(e)    An Assignment and Assumption Agreement in substantially the form attached hereto as **Exhibit E**.

(f)    All other instruments and documents, if any, required to be executed, acknowledged and/or delivered by Purchaser to Seller pursuant to and in accordance with any of the other provisions of this Agreement.

13.    **Covenants of  of the Parties**.

(a)    <u>Conduct of Seller Prior to Closing</u>.

(i)    Seller shall maintain the insurance specified in **Section 9(d)** hereof.

(ii)    Seller will maintain the furniture, fixtures, machinery and equipment which comprise the Assets in the same good condition and working order existing as of the Agreement Date, normal wear and tear excepted.

(iii)    Seller shall, to the extent consistent with the Bankruptcy Code and subject to any orders from time to time of the Court binding on Seller, (A) to continue to operate the Business in the usual and customary manner and use reasonable efforts to preserve intact it present business organization and their relationships with customers, suppliers, and others having business dealings with it, keep available the service of its present employees and preserve its goodwill; (B) not to enter into any transaction or perform any act that would constitute a breach of the representations, warranties, covenants or agreements contained in this Agreement; (C) not increase the amount of salary, compensation or benefits payable or provided to any employee; (D) no do or omit to do any act which may cause a material breach of or default under any commitment or a material breach of any representation, warranty, covenant or agreement made herein by Seller; (E) not take any other action or make any commitment that could reasonably be foreseen to have a materially adverse effect on the Business or the Assets; and (F) maintain its books of account and records in their usual, regular and ordinary manner.

(iv)    To pay, when due and owing, tax obligations relating to taxable periods ending prior to the Closing Date.

(v)    Seller shall provide final revised Schedules to Purchaser on the Closing Date, in each case marked to reflect any changes thereon, so that their representations and warranties shall be deemed repeated on the Closing Date as modified by any final revised schedules; provided, that such revised Schedules to reflect a material adverse change in the

Business or the Assets.

(v)    Without limiting the generality of the other provisions of this Agreement, Seller shall give Purchaser prompt written notice of any material adverse change occurring prior to the Closing Date in any of the information contained in the representations and warranties of Seller hereunder (including in the Schedules hereto) or any Related Document furnished by Seller, provided the delivery of such information shall not create any estoppel, waiver or similar condition.

(vi)    Terminate, amend or modify any Assigned Contracts or Manufacturing Commitments or other agreement, license, contract or instrument used in the Business.

b.    Bankruptcy Action.

(i)    Within five business days following the date hereof, Seller will file with the Bankruptcy Court all papers necessary for the Bankruptcy Court to approve this Agreement and issue the Sale Order.

(ii)    Seller will provide to Purchaser with copies of all motions, applications, and supporting papers prepared by Seller (including forms of orders and notices to interested parties) relating in any way to Purchaser, the transactions contemplated herein, the Business or the Assets prior to the filing thereof.

c.    Compliance With New York State Bulk Sales Laws.    Unless the Sale Order declares that compliance with the bulk sale laws of the State of New York, and the rules and regulations promulgated thereunder, is not required, Seller agrees to comply with its obligations under the New York bulk sales law arising out of the sale of the Assets pursuant to this Agreement. Seller shall notice the New York State Department of Taxation and Finance of the application for the Sale Order.

14.    **Notices**.    All notices, consents, approvals and elections which the parties shall be required or permitted to make or give under this Agreement shall duly be in writing and shall be given to the applicable party in the matter permitted below and at its address or facsimile number set forth below or such other address or facsimile number as the party may later specify for that purpose by notice to the other party:

Seller:                Robert Vermann, President

The Gifford Group, Inc.

{00763142.DOCX;1 }20

250 Dyckman Street
New York, NY 10034

With a copy to:     A. Mitchell Greene, Esq.
           Robinson Brog Leinwand Greene Genovese & Gluck  P.C.
           875 Third Avenue/9th Floor
           New York, NY  10022

Purchaser:       Bernard Alloysius, President
           Infinite Manufacturing Group, Inc.
           171 Coit Street
           Irvington, NJ 07111.

With a copy to:     Norman D. Kallen, Esq.
           Brown Moskowitz & Kallen, P.C.
           180 River Road
           Summit, New Jersey 07901

Each notice shall, for all purposes, be deemed given and received:

(a)  if given by facsimile, when the facsimile is transmitted to the party's facsimile number specified above and confirmation of complete receipt is received by the transmitting party during normal business hours on any business day or on the next business day if not confirmed during normal business hours;

(b)  if by hand, when delivered;

(c)  if given by nationally recognized and reputable overnight delivery service, the business day on which the notice is actually received by the party; or

(d)  if given by certified mail, return receipt requested, postage prepaid, the date shown on the return receipt.

15. **Costs and Expenses**.  Except as set forth herein, all sales, excise, stamp or transfer taxes which may be payable in connection with the transactions contemplated by this Agreement shall be paid by Purchaser.  Except as expressly otherwise provided in this Agreement, the parties shall bear their own costs and expenses in connection with this Agreement and the transactions contemplated hereby, including any attorney and accountants fees.

{00763142.DOCX;1 }21

16.    **Interpretation**. As used in this Agreement, unless the context otherwise specifically requires, the singular includes the plural, and vice-versa, and the masculine includes the feminine, and vice-versa.

17.    **Severability of Provisions**.  If any one or more of the provisions of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality or unenforceability of the remaining provisions of this Agreement shall not be affected thereby.  To the extent permitted by applicable law, each party waives any provision of law which renders any provision of this Agreement invalid, illegal or unenforceable in any respect.

18.    **Governing Law; Venue.**  The parties agree that this Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey.

19.    **Entire Agreement; Amendment**.   This Agreement, including the Exhibits and Schedules hereto, and the Transaction Documents executed and delivered at Closing by the parties hereto, contain the entire understanding between the parties, and supersede and replace the Letter of Intent among the parties as well as any prior oral or written agreements between the parties with respect to the subject matter of this Agreement.  There are no representations, warranties, covenants or undertakings other than those expressly set forth herein.  Modification or waiver of any of the provisions of this Agreement shall be effective only if made in writing and executed with the same formality as this Agreement.

20.    **Waiver**.  The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

21.    **Further Assurances**.  Each party hereto  agrees, at any time and from time to time after the issuance of the Sale Order, to execute, acknowledge where appropriate and deliver such further instruments and documents and to take such other action as the other party may reasonably request in order to carry out the intent and purpose of this Agreement, at the expense of the party making such request, such obligations to survive the Closing.

22.    **Benefit and Assignment**.  This Agreement shall be binding upon the parties hereto, and their heirs, executors, administrators, trustees in bankruptcy, Court appointed officers, successors and assigns.  No party may assign this Agreement to any other person or entity without the prior written consent of the other party; provided, however, that Purchaser shall have the right to assign this Agreement, and all of its rights, benefits and obligations hereunder, at any time on or before the Closing, to any affiliate of Purchaser created for the purpose of purchasing the Business

{00763142.DOCX;1 }22

and the Assets and consummating the transactions contemplated by this Agreement.

23.      **Limitation of Recourse**.   Any remedy available to either party hereunder and any recourse that either party may seek in connection with the transactions contemplated hereby shall be expressly limited to the parties named hereunder and shall in no event extend to or otherwise be available with respect to a party's principals, partners, members, officers, directors, shareholders, managers, employees, lenders and/or agents in their capacity as such.

24.      **Schedules and Exhibits**. All Schedules and Exhibits referred to in this Agreement and attached hereto shall be deemed a part of this Agreement and are hereby incorporated herein by reference.

25.      **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Executed signature pages to this Agreement may be delivered by facsimile, e-mail or other means of electronic transmission and any such signature page shall be deemed an original.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands and seals and caused these presents to be executed by their authorized signatories as of the day and year first above written.

**THE GIFFORD GROUP, INC.**

By:_____

Name:    Robert Vermann

Title:    President


**INFINITE MANUFACTURING GROUP, INC.**

By:_____

Name:    Bernard Alloysius

Title:    President

## SCHEDULE  1
## ASSETS

Fixtures

None

Equipment

| Item | Manufacturer | Model | Serial # |
|---|---|---|---|
| Band Saw | Delta | 28641 | HI-03363 |
| Compressor | Sullair | LS10-25 | 003-113903 |
| Compressor | Ingersol Rand | 15T | 349972 |
| Drill Press #1 | Delta | DP300L | 15791 |
| Drill Press #2 | Delta | 70-200 | W9901 |
| Drill Press #3 | Rikon | 30-230 | 4243020203 |
| Edge Polisher #1 | Bermaq | AMI1 2500 | 271 |
| Edge Polisher #2 | Bermaq | AM2 | 147 |
| Edge Polisher #3 | Bermaq | AM1 | |
| Foam Machine | Sealed Air | 100 44 10 | IT-03364 |
| Fork Lift | Komatsu | FG15 ST-16 | 600202A |
| Fork Lift | Cat | 2ET40000 | FN438367 |
| Ice Machine | Ice-O-Matic | 0250FW | A211044192 |
| Laser | Cutlite Penta | PL2010 | 80012462 |
| Laser | Cutlite Penta | MPL2515 | 1203291 |
| Lathe | Grizzly | G4002 | 830173 |
| Oven, Gas | Gehnrich Oven Sales | | |
| Oven Electric | Lydon | 244251 | |
| Overhead Saw | Hendrick | HS-150 | H9010005 |
| Pizza Oven #1 | | | |
| Pizza Oven #2 | | | |
| Polishing Wheel | US Electrical | 501Y | |
| Polishing Wheel | Baldor Buffer | 409B | |
| Polishing Wheel | Queens Industrial | 3403 | |
| Shaper | Kufo | SK-28SP | |
| Shaper | Wadsworth | N29 | |
| Shaper | Delta | 43431 | 02F51333 |
| Strip Heater | C R Clarke | 1200 | |
| Table Saw #1 | Powermatic | 72A | 1720296 |
| Table Saw #2 | JET | JTAS10XLI | 5090550 |
| Table Saw #3 | Powermatic | 72 | 672112 |
| Tanning Bed | SunQuest | VAO 2000S | 2697 |
| Tapping | Procunier | 1-E | 198 |
| Time Clock | Cincinnati Time Recorder | MJR7000 | 374944958 |
| Vac/Pressure Pump | Rietschle | | F0303243498 |
| Van | GMC  2005 | | 1GTHG35U651130037 |

Supplies

Acrylic Sheets

Assigned Contracts

| Contract Counterparty | Type of Contract |
|---|---|
| Wells Fargo | Copier |
| Wells Fargo | Copier |
| Wells Fargo | Copier |
| De Lage Landen Financial Services, Inc. | Forklift Capital Lease |
| LDS Church Real Estate | Commercial Lease |
| Toyota Financial Services | Car Lease |

## 2
## ADDITIONAL EXCLUDED ASSETS

## SCHEDULE 3

## ALLOCATION OF PURCHASE PRICE

# SCHEDULE 7
## DISCLOSURE SCHEDULE

### Contracts

All contracts not assigned pursuant to Schedule 1 shall be rejected by order of the Bankruptcy
Court, unless Purchaser indicates otherwise

## EXHIBIT A

## CLOSING CERTIFICATE OF SELLER

## To be provided

**<u>EXHIBIT BBILL OF SALE</u>**

**<u>[FOLLOWS]</u>**

## EXHIBIT C
## ASSIGNMENT AND ASSUMPTION AGREEMENT

## [FOLLOWS]

## EXHIBIT D
## CLOSING CERTIFICATE PURCHASER

## [FOLLOWS]

## EXHIBIT E
## PURCHASER INCUMBENCY CERTIFICATE

### [FOLLOWS]

**Exhibit B**

**Executory Contracts and Leases**

| Counterparty | Type of Contract/Lease | Cure Amount |
|---|---|---|
| Wells Fargo | Copier | None |
| Wells Fargo | Copier | None |
| Wells Fargo | Copier | None |
| De Lage Landen Financial Services, Inc. | Forklift Capital Lease | None |
| LDS Church Real Estate | Commercial Lease | $85,912.75 |
| Toyota Financial Services | Car Lease | $299.00 |

## Manufacturing Commitments

# Tuesday, December 15, 2015

| Name | | | Number | Date | Description | Date | Date | Qty | Amount |
|---|---|---|---|---|---|---|---|---|---|
| Duxbury | | | 54938 | 11-Dec | laser discs | 13-Dec | 15-Dec | 8 | 90 |
| Industrial | | 1D | 54933 | 10-Dec | 8" dome | 15-Dec | 15-Dec | 1 | 100 |
| Radii | | | 54772 | 16-Oct | building model | 7-Nov | 15-Dec | 1 | 11,445 |
| John Gonzalez | | C | 54925 | 9-Dec | five sided ps30 | 11-Dec | 16-Dec | 1 | 150 |
| Steve Blatz | | 1D | 54919 | 7-Dec | sample box corner | 14-Dec | 16-Dec | 1 | 250 |
| Encore | | C | 54904 | 1-Dec | magnetic Plaks | 11-Dec | 17-Dec | 10 | 450 |
| Steven Rose | | | 54885 | 25-Nov | laser boxes | 7-Dec | 17-Dec | 7 | 336 |
| Venfield | | 1D | 54900 | 1-Dec | bent U & strips | 11-Dec | 17-Dec | 17 | 226 |
| AFD | | C | 54877 | 23-Nov | machined block/disk/tu | 11-Dec | 18-Dec | 112 | 6,130 |
| DimCom | | 1D | 54921 | 8-Dec | five sided ps30 | 18-Dec | 18-Dec | 4 | 2,140 |
| Duxbury | | | 54728 | 5-Oct | 3form boxes 39" | 20-Nov | 18-Dec | 348 | 40,884 |
| Great Will Construction | L | 1D | 54902 | 1-Dec | formed diffusers | 18-Dec | 18-Dec | 22 | 7,670 |
| Isolated Labs | | C | 54916 | 4-Dec | 30" boxes w/sintra | 18-Dec | 18-Dec | 8 | 4,280 |
| Isolated labs | | C | 54917 | 4-Dec | 36" boxes with sintra | 18-Dec | 18-Dec | 8 | 5,000 |
| Kagan | | C | 54894 | 30-Nov | stepped panel w/return | 18-Dec | 18-Dec | 1 | 1,200 |
| Lukas | | 1D | 54905 | 1-Dec | five sided white | 18-Dec | 18-Dec | 21 | 1,208 |
| Vinoly | | | 54806 | 11-Dec | five sided ps30 | 18-Dec | 18-Dec | 1 | 500 |
| Atlantic Trophy | L | C | 54874 | 19-Nov | triangle trophy | 8-Dec | 21-Dec | 10 | 1,550 |
| Charles Ross | L | 1D | 54759 | 13-Oct | 96" prism | 30-Oct | 21-Dec | 1 | 6,000 |
| Acropolis Glass | L | 1D | 54924 | 9-Dec | bronze arc | 23-Dec | 23-Dec | 5 | 2,700 |
| Acumen | | 1D | 54932 | 10-Dec | Five sided ps30 | 23-Dec | 23-Dec | 1 | 263 |
| Charles Ross | | | 54937 | 11-Dec | adjust Prisms | 23-Dec | 23-Dec | 36 | 0 |
| Faro | | 1D | 54934 | 10-Dec | Capped tube | 23-Dec | 23-Dec | 1 | 900 |
| Venfield | | | 54901 | 1-Dec | bent chair arms | 11-Dec | 23-Dec | 2 | 500 |
| Kagan | | C | 54911 | 3-Dec | stepped blocks | 24-Dec | 24-Dec | 2 | 3,090 |
| NY custom | | C | 54912 | 3-Dec | 2x2 table base | 24-Dec | 24-Dec | 1 | 1,785 |
| R. H. Guest | | | 54935 | 11-Dec | Triangular covers | 5-Jan | 5-Jan | 14 | 22,310 |
| Isolated Labs | | 1D | 54939 | 11-Dec | Capped tubes | 7-Jan | 7-Jan | 8 | 840 |
| Carlton House | | C | 54678 | 16-Sep | 2" with notches | 30-Sep | | 2 | 5,400 |
| Duxbury | | 1D | 54729 | 5-Oct | 3form boxes | 20-Nov | | 300 | 35,283 |
| Infinite | | | 54914 | 3-Dec | carved head model | 24-Dec | | 1 | 1,000 |
| Ray Griffiths jewels | | C | 54798a | 27-Oct | screened blocks | 13-Nov | | 50 | 0 |