**ROBINSON BROG LEINWAND GREENE
 GENOVESE & GLUCK P.C.**
875 Third Avenue
New York, New York 10022
A. Mitchell Greene
(212) 603-6300
*Proposed Attorneys for the Debtor and Debtor in Possession*

**Hearing Date and Time:**
**January 7, 2016 at 10:30 a.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

In re:

**THE GIFFORD GROUP, INC.
D/B/A JUST PLASTICS,**

                     Debtor.

-----------------------------------------------------------X

Chapter 11

15-13205-smb

## DECLARATION OF ROBERT C. VERMANN IN SUPPORT OF MOTION FOR ENTRY OF ORDER AUTHORIZING DEBTOR (A) TO SELL ASSETS OF THE ESTATE FREE AND CLEAR OF ANY AND ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS PURSUANT TO 11 U.S.C. SECTION 363(b) AND (f), (B) TO ASSUME AND ASSIGN EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO 11 U.S.C. SECTION 365, AND (C) GRANTING RELATED RELIEF

I, **Robert C. Vermann,** declare under penalty of perjury as follows:

1. I am the president and sole shareholder of The Gifford Group, Inc. d/b/a Just Plastics (the "Debtor") and am fully familiar with the facts set forth herein.

2. I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify to the matters stated herein.

3. I submit this declaration in further support of the Debtor's Motion For Entry of Order Authorizing Debtor (A) to Sell Assets of the Estate Free and Clear of Any and All Liens,

Claims, Encumbrances and Interests Pursuant to 11 U.S.C. § 363(b) and (f), (B) to Assume and Assign Executory Contracts and Unexpired Leases Pursuant to 11 U.S.C. § 365, and (C) Granting Related Relief (the "Sale Motion").

4. For the past 70 years, the Debtor fabricated custom goods from acrylic plastics. The Debtor specialized in the making of custom pieces for both commercial and personal uses, including custom furniture, custom display cases and unique designs . Due to the economic crisis of 2008, the Debtor's business suffered a steep decline in sales and revenue. Prior to the 2008 economic crisis, the Debtor generated approximately $3 million in sales, while in 2009, the Debtor only generated approximately $1 million in sales.

5. Between 2008 and 2013, in order to maintain the Debtor's operations, and not have to reduce its employee base, coupled with the belief that business would recover, the Debtor secured various financing, including two secured loan obligations, an unsecured line of credit, and took additional loans from the Debtor's principal. However, business never rebounded to pre-2008 levels. As a result, in February 2013, the Debtor was forced to reduce its staff from 27 employees to 13 employees. With the reduction in staff, the Debtor was able to operate profitably, but despite increased revenue, the Debtor was unable to service its accumulated debt.

6. Starting in 2013, with the assistance of Libin and Katz, a business broker, the Debtor actively pursued potential purchasers for the Debtor's business. The broker was able to bring in six potential purchasers and the Debtor and I engaged in informal discussions with these potential purchasers to gauge their levels of interest. I met with the potential purchasers and had informal interviews, exchanged general information regarding the Debtor's business, and were

given tours of the Debtor's facilities.  While these purchasers did express interest in acquiring the Debtor's business after reviewing the Debtor's financials, no formal offers were tendered.

7.	In 2014, the Debtor renewed its efforts to sell its business.  With the assistance of Barry Sorrentino of the consulting firm Management Services Consultants, I was introduced to Steve Lauterback, who operated an independent marketing business and expressed significant interest in acquiring the Debtor's business.  Mr. Lauterback engaged in significant due diligence and entered into a handshake deal for less than the current sale proposal as set forth in the proposed APA with the Purchaser, which the Debtor now seeks approval of, however, Mr. Lauterback ultimately walked away from that deal.

8.	The Debtor also reached out to its clients and competitors to see if there was any interest in taking over the Debtor's business.  In order to further these efforts, I met with a number of clients who had expressed an interest in acquiring the Assets, one of which was Lukas Lighting, a long-time client.  Lukas Lighting expressed significant interest, but did not have the necessary cash to consummate a deal with the Debtor.

9.	Over a year later, and with the financial conditions of the company deteriorating, the Debtor met with the Purchaser, another long time client with significant experience in the plastic industry and familiarity with the Debtor's business. Ultimately, the Purchaser proved to be the only party willing to step in and save what is left of the business.  They are familiar with the Debtor's overall business and at this point were the only interested purchaser to offer "cash" in the amount of $210,000, with the Debtor retaining up to $30,000 in receivables, and payment of $85,912.75 in cure costs to purchase the Debtor's business.  The Purchaser intends to continue the Debtor's operations, retain the Debtor's current employees, while also honoring current

employee benefit programs, thus minimizing the Debtor's priority wage obligations, and maintain current relationships with the Debtor's long-time suppliers.

10. A condition to the Sale is that I, the Debtor's President and 100% interest holder, shall have entered into an employment agreement satisfactory to both the Purchaser and myself. The Purchaser will not proceed with the Sale if I am not part of the process, as my services are necessary for the transition of the Debtor's business to the Purchaser. My services are also essential to the consummation of the Sale due to my years of experience in the plastics business, including significant design experience, and my well-regarded reputation in the plastics business that will allow the Purchaser to maintain its foothold in New York City and expand the customer base.

I declare under penalty of perjury under the laws of the United States, pursuant to 28 U.S.C. §1746, that the foregoing is true and correct.

Dated: New York, New York
      December 16, 2015

                                                        Robert C. Vermann